## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

UNITED STATES OF AMERICA,     )
                                 )
          Plaintiff,     )
                                 )
          v.        )     Civil Action No. 13-584-JPG-SCW
                                 )
NEW RIVER ROYALTY, LLC,     )
                                 )
          Defendant.     )
                                 )

## CONSENT DECREE

WHEREAS, Plaintiff, the United States of America, on behalf of the U.S. Environmental Protection Agency ("EPA"), filed the Complaint herein against New River Royalty, LLC, ("Defendant"), alleging that Defendant violated Section 301(a) of the Clean Water Act ("CWA"), 33 U.S.C. § 1311(a);

WHEREAS, the Complaint alleges that the Defendant violated 33 U.S.C. § 1311(a) by discharging pollutants, in the form of both fill material and soils eroded by storm water runoff, into waters of the United States located northeast of the intersection of Corinth and Dwina Roads in Williamson County, Illinois ("Dwina Road Site"), without permits issued pursuant to CWA Sections 402 or 404, 33 U.S.C. §§ 1342, 1344, as more fully described in the Complaint;

WHEREAS, the Complaint seeks, inter alia, to: (1) enjoin the discharge of pollutants into waters of the United States in violation of CWA Section 301(a), 33 U.S.C. § 1311(a); (2) require Defendant, at its own expense and at the direction of EPA, to restore and/or mitigate the damages caused by its unlawful activities; and (3) require Defendant to pay civil penalties to the United States as provided in Section 319(d) of the CWA, 33 U.S.C. § 1319(d);

WHEREAS, the United States and Defendant agree that settlement of this case is in the public interest and that entry of this Consent Decree is the most appropriate means of resolving the United States' claims under the CWA against Defendant in this case; and

WHEREAS, the Court finds that this Consent Decree is a reasonable and fair settlement of the United States' claims against Defendant in this case, and that this Consent Decree adequately protects the public interest in accordance with the CWA and all other applicable federal law.

THEREFORE, before the taking of any testimony upon the pleadings, without further adjudication of any issue of fact or law, and upon consent of the parties hereto by their authorized representatives, it is hereby ORDERED, ADJUDGED and DECREED as follows:

## I.    JURISDICTION AND VENUE

1.    This Court has jurisdiction over the subject matter of this action and over Defendant pursuant to CWA Section 309(b), 33 U.S.C. § 1319(b), and 28 U.S.C. §§ 1331, 1345, and 1355.

2.    Venue is proper in the Southern District of Illinois pursuant to CWA Sections 309(b), 33 U.S.C. § 1319(b), and 28 U.S.C. §§ 1391(b) and (c) and 1395(a), because the Defendant conducts business in this District, the Dwina Road Site is located in this District, and the cause of action alleged herein arose in this District.

3.    The Complaint states claims upon which relief can be granted pursuant to CWA Sections 301, 309, 402, and 404, 33 U.S.C. §§ 1311, 1319, 1342, and 1344.

2

## II.    APPLICABILITY

4.     The obligations of this Consent Decree shall apply to and be binding upon Defendant, its officers, directors, agents, employees and servants, and its successors and assigns and any person, firm, association or corporation who is, or will be, acting in concert or participation with the Defendant, whether or not such person has notice of this Consent Decree. In any action to enforce this Consent Decree against the Defendant, the Defendant shall not raise as a defense the failure of any of its officers, directors, agents, employees, successors or assigns or any person, firm or corporation acting in concert or participation with the Defendant, to take any actions necessary to comply with the provisions hereof.

5.     Any transfer of ownership or other interest in the Dwina Road Site or the property defined at Paragraph 13 of this Consent Decree as the "Mitigation Site" shall not alter or relieve Defendant of its obligation to comply with all of the terms of this Consent Decree.  At least fifteen (15) days prior to the transfer of ownership or other interest in the Dwina Road Site or the Mitigation Site or any portion thereof, the party making such transfer shall provide written notice and a true copy of this Consent Decree to its successors in interest and shall simultaneously notify EPA and the United States Department of Justice at the addresses specified in Section XII below that such notice has been given.  As a condition to any such transfer, the party making the transfer shall reserve all rights necessary to comply with the terms of this Consent Decree.

## III.    DEFINITIONS AND SCOPE

6.     Terms used in this Consent Decree that are defined in the CWA or in regulations promulgated pursuant to the CWA shall have the meanings assigned to them in the CWA or such

regulations, unless otherwise provided for in this Decree.  Whenever the terms set forth below are used in this Consent Decree the following definitions shall apply.

7.      "Complaint" shall mean the complaint filed by the United States in this action.

8.      "Consent Decree" or "Decree" shall mean this Decree and all appendices attached hereto.

9.      "Day" shall mean a calendar day unless expressly stated to be a business day.  In computing any period of time under this Consent Decree, where the last day would fall on a Saturday, Sunday, or federal holiday, the period shall run until the close of business of the next day.

10.     "Defendant" shall mean New River Royalty, LLC.

11.     "EPA" shall mean the United States Environmental Protection Agency and any of its successor departments or agencies.

12.     "Effective Date" shall have the definition provided in Section XV.

13.     "Mitigation Site" shall mean the property specifically described in the Mitigation Plan approved in accordance with Paragraph 38 of this Decree.

14.     "Paragraph" shall mean a portion of this Decree identified with a paragraph number.

15.     "Parties" shall mean the United States and the Defendant.

16.     "Section" shall mean a portion of this Decree identified by a roman numeral.

17.     "Site" or "Dwina Road Site" shall mean the property located northeast of the intersection of Corinth and Dwina Roads in Williamson County, Illinois.

4

18.    "United States" shall mean the United States of America, acting on behalf of the EPA.

### IV.    EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS

19.    This Consent Decree resolves the civil claims of the United States for the violations alleged in the Complaint filed in this action through the date of lodging.  Defendant waives any right to seek termination or modification of this Consent Decree based upon future decisions of any court in any case unrelated to the Defendant or this Consent Decree or the Dwina Road Site, with respect to the regulatory jurisdiction under the CWA.

20.    It is the express purpose of the parties in entering this Consent Decree to further the objectives set forth in CWA Section 101, 33 U.S.C. § 1251.  All plans, studies, construction, remedial maintenance, monitoring programs, and other obligations in this Consent Decree or resulting from the activities required by this Consent Decree shall have the objective of causing Defendant to achieve and maintain full compliance with, and to further the purposes of, the CWA.

21.    Defendant and Defendant's agents, successors and assigns are enjoined from discharging any pollutant into waters of the United States at the Dwina Road Site, unless such discharge complies with the provisions of the CWA and its implementing regulations.

22.    This Consent Decree is not a permit, or a modification of any permit, under any federal, State, or local laws or regulations.  Defendant is responsible for achieving and maintaining complete compliance with all applicable federal, State, and local laws, regulations, and permits; and Defendant's compliance with this Consent Decree shall be no defense to any action commenced pursuant to any such laws, regulations, or permits, except as set forth herein.

The United States does not, by its consent to the entry of this Consent Decree, warrant or aver in any manner that Defendant's compliance with any aspect of this Consent Decree will result in compliance with Sections 402 and 404 of the Act, 33 U.S.C. §§ 1342 and 1344, or with any other provisions of federal, State, or local laws, regulations, or permits. Nothing in this Consent Decree shall limit the ability of the U.S. Army Corps of Engineers ("Corps") or the State of Illinois to issue, modify, suspend, revoke or deny any individual permit or any general permit, nor shall this Consent Decree limit the EPA's ability to exercise its authority pursuant to Sections 402 and 404 of the CWA, 33 U.S.C. §§ 1342 and 1344.

23.     This Consent Decree does not limit or affect the rights of Defendant or of the United States against any third parties, not party to this Consent Decree, nor does it limit the rights of third parties, not party to this Consent Decree, against Defendant, except as otherwise provided by law.

24.     The United States reserves all legal and equitable remedies available to enforce the provisions of this Consent Decree, except as expressly stated in Paragraph 19. This Consent Decree shall not be construed to limit the rights of the United States to obtain penalties or injunctive relief under the Act or implementing regulations, or under other federal laws, regulations, or permit conditions, except as expressly specified in Paragraph 19.

25.     This Consent Decree shall not be construed to create rights in, or grant any cause of action to, any person or entity not party to this Consent Decree.

26.     This Consent Decree is the result of a compromise of disputed law and facts and nothing herein shall constitute an admission of fact or law by any party.

## V.  SPECIFIC PROVISIONS

### CIVIL PENALTIES

27.     Within thirty (30) Days after the Effective Date of this Consent Decree,

Defendant shall, in accordance with the procedures set forth in Paragraph 28, pay a civil penalty

of eight hundred and twenty thousand dollars and no cents ($820,000.00), together with interest

accruing from the date on which the Consent Decree is lodged with the Court at the interest rate

specified in 28 U.S.C. § 1961 as of the date of lodging.

28.     Defendant shall make all payments that are due and owing under the terms of this

Consent Decree, by FedWire Electronic Funds Transfer ("EFT" or wire transfer), to the U.S.

Department of Justice account in accordance with current electronic funds transfer procedures,

referencing the U.S.A.O. file number to be supplied by the United States and the DOJ case

numbers 90-5-1-1-10180 and 90-5-1-1-18561/1.  Payment shall be made in accordance with

instructions provided to the Defendant by the Financial Litigation Unit of the United States

Attorney's Office for the Southern District of Illinois.  Any payments received by the

Department of Justice after 4:00 P.M. (Eastern Time) will be credited on the next business day.

29.     Upon payment of any penalties required by this Consent Decree, Defendant shall

provide written notice, at the addresses specified in Section XII of this Consent Decree, that such

payment was made in accordance with Paragraph 28 of this Consent Decree.

30.     Penalty payments pursuant to this Consent Decree (including stipulated penalties

provided for herein) are penalties within the meaning of Section 162(f) of the Internal Revenue

Code, 26 U.S.C. § 162(f), or of 26 C.F.R. § 1.162-21, and are not tax deductible expenditures for

purposes of federal law.

7

## VI.   RESTORATION, MITIGATION AND PRESERVATION COMPLIANCE ORDER REQUIREMENTS

31.    Defendant shall immediately comply with all applicable storm water requirements at the Dwina Road Site and shall not violate the prohibition in Section 301(a) of the CWA by discharging pollutants in storm water without an applicable permit or by making prohibited non-storm water discharges, to waters of the United States at the Dwina Road Site.

32.    For a period of one year from the entry date of this Consent Decree, Defendant shall conduct semi-annual inspections of the Dwina Road Site in order to monitor and maintain measures designed to prevent erosion of soil into the Dwina Road Site streams through storm water runoff.  Such inspections shall include an evaluation of Dwina Road Site conditions including vegetation, silt fencing, stream crossings, drainage patterns, and eroded areas.  Within thirty (30) Days of each inspection but in any event by no later than the 15th day of April and October, Defendant shall submit to EPA an inspection report describing the Dwina Road Site conditions as well as any planned corrective measures.  If required by EPA, Defendant shall implement additional corrective measures necessary to prevent erosion of soil into the streams.

33.    For a period of two years from the entry date of this Consent Decree, New River Royalty will maintain signage at regular intervals around the perimeter of the Dwina Road Site to prevent unauthorized access.  Other access controls will also be required, as necessary, to prevent damage to erosion control measures.

34.    Defendant immediately shall cease any discharges of dredged or fill material into waters of the United States at the Dwina Road Site that are not authorized by a Section 404 permit.

35.     The Parties acknowledge that Nationwide Permit 32 ("NWP 32"), found at 77 Fed. Reg. 10,184, 10,277 (Feb. 21, 2012), authorizes any fill that was placed in the streams at the Dwina Road Site only upon meeting all conditions of this Consent Decree and that any such fill shall remain in place subject to the conditions provided in NWP 32 and this Consent Decree. The Parties further acknowledge that NWP 32 authorizes the discharge of dredged or fill material insofar as such discharge is necessary to complete the work required to be performed pursuant to this Consent Decree.  Any such discharge of dredged or fill material necessary for work required by this Consent Decree shall be subject to the conditions of NWP 32 and this Consent Decree.

36.     By no later than June 1, 2013, Defendant shall complete and report to EPA baseline biological monitoring for the Mitigation Site.

37.     Within thirty (30) Days of submission of the baseline biological monitoring report referred to in Paragraph 36 above, Defendant shall submit a mitigation plan for approval to EPA ("Mitigation Plan") that is consistent with the minimum requirements set out in Appendix A attached hereto.

38.     After submission of the Mitigation Plan, EPA shall review the Mitigation Plan and shall in writing, either: (a) approve the submission; (b) approve the submission upon specified conditions; (c) approve part of the submission and disapprove the remainder; or (d) disapprove the submission.

39.     If the Mitigation Plan is approved pursuant to Paragraph 38(a), Defendant shall commence implementation of the Mitigation Plan no later than four months after receipt of written approval of the Plan from EPA.

40.    If the Mitigation Plan is conditionally approved or approved only in part, pursuant to Paragraph 38(b) or (c), Defendant shall, upon written direction from EPA, take all actions required by the approved portions of the Mitigation Plan that EPA determines are technically severable from any disapproved portions, subject to Defendant's right to dispute only the specified conditions or the disapproved portions, under Section IX of this Decree (Dispute Resolution).

41.    If the Mitigation Plan is disapproved in whole or in part pursuant to Paragraph 38 (c) or (d), Defendant shall within thirty (30) Days or such other time as the Parties agree to in writing, correct all deficiencies and resubmit the Mitigation Plan or disapproved portion thereof for approval in accordance with the preceding Paragraphs.  If the resubmission is approved in whole or in part, Defendant shall proceed in accordance with the preceding Paragraphs.

42.    Defendant shall perform the Mitigation Plan as approved by EPA in accordance with NWP 32, Appendix A, and with the provisions of this Consent Decree.

43.    To ensure that all parcels of land on which the mitigation activities take place remain preserved, Defendant shall, within sixty (60) Days after the completion of mitigation activities, record for each such parcel a Declaration of Restrictive Covenant for Conservation with the County Recorder Office, in Williamson County, Illinois.  Defendant shall ensure that each such Declaration of Restrictive Covenant for Conservation is written and recorded in a manner that fully complies with State and local laws.  Thereafter, each deed, title, or other instrument conveying an interest in any property that forms part or all of the Mitigation Site shall contain a notice stating that the property is subject to the Declaration of Restrictive Covenant for Conservation and shall reference the recorded location of the Declaration and any restrictions

applicable to the property under the Declaration.  For purposes of this Consent Decree, "completion of mitigation activities" shall mean completion of all construction, grading, seeding, and planting activities set forth in the Mitigation Plan approved by EPA, but shall not include subsequent water or other monitoring requirements.

44.     Any stipulated penalties applicable to the original submission, as provided in Section XI of this Decree, shall accrue during the 30-Day period referred to in Paragraph 41 or other specified period, but shall not be payable unless the resubmission is untimely or disapproved in whole or in part; provided that, if the original submission was so deficient as to constitute a material breach of Defendant's obligations under this Decree, the stipulated penalties applicable to the original submission shall be due and payable notwithstanding any subsequent resubmission.

45.     If a resubmitted Mitigation Plan is disapproved in whole or in part, EPA may again require Defendant to correct any deficiencies, in accordance with the preceding Paragraphs, subject to Defendant's right to invoke Dispute Resolution and the right of EPA to seek stipulated penalties as provided in the preceding Paragraphs.

46.     Within sixty (60) Days after the completion of mitigation activities, Defendant shall certify to EPA the completion of such activities.  Defendant's certification shall include photographs and/or videotape, a detailed description of the activities that took place, and "as built" drawings with topographic information showing the completed mitigation activities throughout the entire Mitigation Site.

## VII.   NOTICES AND OTHER SUBMISSIONS

47.      Within thirty (30) Days after the deadline for completing any of the tasks set forth in Paragraphs 29, 32, 36, 37, 39, 43, and 46 of this Consent Decree, the tasks described in Paragraphs 4.1,  5, and 6  of Appendix A to this Consent Decree, and/or any task associated with a deadline established in the Mitigation Plan, Defendant shall provide the United States with written notice ("Task Report"), at the addresses specified in Section XII of this Consent Decree, of whether or not that task has been completed.  For the purposes of the notices required by this paragraph, notice to the United States may be accomplished by supplying the Task Report to the EPA officials identified in Paragraph 81.A.

48.      If the required task has been completed late, the Task Report shall specify the date when it was completed, and explain the reasons for any delay in completion beyond the scheduled time for such completion required by the Consent Decree.

49.      The Task Report shall also include a description of any noncompliance with the requirements of this Consent Decree and an explanation of the violation's likely cause and the remedial steps taken, or to be taken, to prevent or minimize such violations.  If the cause of a violation cannot be fully explained at the time the Task Report is due, Defendant shall so state in the Task Report.  Defendant shall investigate the cause of the violation and shall then submit an amendment to the report, including a full explanation of the cause of the violation, within thirty (30) Days of when Defendant becomes aware of the cause of the violation.  Nothing in this Paragraph or the following Paragraph relieves Defendant of its obligations to provide the notice required by Section X of this Consent Decree (Force Majeure).

50.    Whenever any violation of this Consent Decree or any other event affecting Defendant's performance under this Decree may pose an immediate threat to the public health or welfare of the environment, Defendant shall notify EPA orally or by electronic or facsimile transmission as soon as possible, but no later than 24 hours after Defendant first knows of the violation or event.  This procedure is in addition to the requirements set forth in the preceding Paragraphs.

51.    In all notices, documents or reports submitted to the United States pursuant to this Consent Decree, the Defendant shall, by signature of a senior management official, certify such notices, documents and reports as follows:

> I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted.  Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering such information, the information submitted is, to the best of my knowledge and belief, true, accurate and complete.  I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.

52.    The reporting requirements of this Consent Decree do not relieve Defendant of any reporting requirements required by the Clean Water Act or implementing regulations, or by any other federal, state, or local law, regulation, permit, or other requirement.

53.    Any information provided pursuant to this Consent Decree may be used by the United States in any proceeding to enforce the provisions of this Consent Decree and as otherwise permitted by law.

## VIII.   <u>RETENTION OF RECORDS AND RIGHT OF ENTRY</u>

54.     Until ten years after entry of this Consent Decree, Defendant shall preserve and retain all records and documents now in its possession or control or which come into its possession or control that relate in any manner to the performance of the tasks conducted under this Consent Decree, regardless of any corporate retention policy to the contrary.  Until ten years after entry of this Consent Decree, Defendant shall also instruct its contractors and agents to preserve all documents, records, and information of whatever kind, nature or description relating to the performance of the tasks done pursuant to this Consent Decree.

55.     At the conclusion of the document retention period, Defendant shall notify the United States at least ninety (90) Days prior to the destruction of any such records or documents, and, upon request by the United States, Defendant shall deliver any such records or documents to EPA.  The Defendant may assert that certain documents, records and other information are privileged under the attorney-client privilege or any other privilege recognized by federal law.  If the Defendant asserts such a privilege, it shall provide the United States with the following:  (1) the title of the document, record, or information; (2) the date of the document, record, or information; (3) the name and title of the author of the document, record, or information; (4) the name and title of each addressee and recipient; (5) a description of the subject of the document, record, or information; and (6) the privilege asserted by Defendant.  However, no documents, reports or other information created or generated pursuant to the requirements of the Consent Decree shall be withheld on the grounds that they are privileged.

56.     Right of Entry

      A.     Until termination of this Consent Decree, the United States and its authorized representatives and contractors shall have authority at all reasonable times to enter the Defendant's premises to:

      1.     Monitor the activities required by this Consent Decree;

      2.     Verify any data or information submitted to the United States;

      3.     Obtain samples;

      4.     Inspect and evaluate Defendant's restoration and/or mitigation activities; and

      5.     Inspect and review any records required to be kept under the terms and conditions of this Consent Decree and the CWA.

      B.     This provision of this Consent Decree is in addition to, and in no way limits or otherwise affects, the statutory authority of the United States to any right of entry and inspection, or any right to require monitoring, maintain documents and records or other information, and to obtain information from the Defendant, as authorized by law.

## IX.     DISPUTE RESOLUTION

57.     Unless otherwise expressly provided for in this Consent Decree, the dispute resolution procedures of this Section shall be the exclusive mechanism to resolve disputes arising under or with respect to this Consent Decree.

58.     Any dispute that arises with respect to the meaning or requirements of this Consent Decree shall be, in the first instance, the subject of informal negotiations between the United States and the Defendant to attempt to resolve such dispute. The period for informal negotiations shall not extend beyond thirty (30) Days beginning with written notice by one party

to the other affected party that a dispute exists, unless agreed to in writing by those parties. If a dispute between the United States and the Defendant cannot be resolved by informal negotiations, then the position advanced by the United States shall be considered binding unless, within fourteen (14) Days after the end of the informal negotiations period, the Defendant invokes formal dispute resolution procedures as set forth below.

59.     Formal Dispute Resolution.  Defendant shall invoke formal dispute resolution procedures, within the time period provided in the preceding Paragraph, by serving on the United States a written Statement of Position regarding the matter in dispute.  The Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinions supporting Defendant's position and any supporting documentation relied upon by Defendant.

60.     The United States shall serve its Statement of Position within forty-five (45) Days of receipt of Defendant's Statement of Position, unless another time period is agreed upon by the parties.  The United States' Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinions supporting that position and any supporting documentation relied upon by the United States.  The United States' Statement of Position shall be binding on Defendant, unless Defendant files a motion for judicial review of the dispute in accordance with the following Paragraph.

61.     Defendant may seek judicial review of the dispute by filing with the Court and serving on the United States, in accordance with Section XVI of this Consent Decree, a motion requesting judicial resolution of the dispute.  The motion must be filed within ten (10) Days of receipt of the United States' Statement of Position pursuant to the preceding Paragraph.  The motion shall contain a written statement of Defendant's position on the matter in dispute,

including any supporting factual data, analysis, opinion, or documentation, and shall set forth the relief requested and any schedule within which the dispute must be resolved for orderly implementation of the Consent Decree.

62.    The United States shall respond to Defendant's motion within the time period allowed by the Local Rules of this Court. Defendant may file a reply memorandum, to the extent permitted by the Local Rules.

63.    Standard of Review

A.    <u>Disputes Concerning Matters Accorded Record Review.</u>  Except as otherwise provided in this Consent Decree, in any dispute brought under Paragraph 59 pertaining to the adequacy or appropriateness of plans, procedures to implement plans, schedules or any other items requiring approval by EPA under this Consent Decree; the adequacy of the performance of work undertaken pursuant to this Consent Decree; and all other disputes that are accorded review on the administrative record under applicable principles of administrative law, Defendant shall have the burden of demonstrating, based on the administrative record, that the position of the United States is arbitrary and capricious or otherwise not in accordance with law.

B.    <u>Other Disputes.</u>  Except as otherwise provided in this Consent Decree, in any other dispute brought under Paragraph 59, Defendant shall bear the burden of demonstrating that its position fulfills the terms, conditions, requirements and objectives of this Consent Decree as expeditiously as possible.

64.    If the United States believes that a dispute is not a good faith dispute, or that a delay would pose or increase a threat of harm to the public or the environment, it may move the Court for a resolution of the dispute prior to the expiration of the thirty (30) day period for

informal negotiations. Defendant shall have fourteen (14) days to respond to the motion and propose an alternate resolution. In resolving any such dispute, Defendant shall bear the burden of proving by a preponderance of the evidence that the United States' position is not in accordance with the objectives of this Consent Decree, and that Defendant's position will achieve compliance with the terms and conditions of this Consent Decree and the CWA.

65.     The filing of a motion asking the Court to resolve a dispute shall not extend or postpone any obligation of Defendant under this Consent Decree, except as provided in Paragraph 76 below regarding payment of stipulated penalties.

## X.     FORCE MAJEURE

66.     Defendant shall perform the actions required under this Consent Decree within the time limits set forth or approved herein, unless the performance is prevented or delayed solely by events which constitute a Force Majeure event. A Force Majeure event is defined as any event arising from causes beyond the control of Defendant, including its employees, agents, consultants and contractors, which could not be overcome by due diligence and which delays or prevents the performance of an action required by this Consent Decree within the specified time period. A Force Majeure event does not include, inter alia, increased costs of performance, changed economic circumstances, changed labor relations, normal precipitation or climate events, changed circumstances arising out of the sale, lease or other transfer or conveyance of title or ownership or possession of a site, or failure to obtain federal, state or local permits.

67.     If Defendant believes that a Force Majeure event has affected Defendant's ability to perform any action required under this Consent Decree, Defendant shall provide notice orally or by electronic or facsimile transmission to EPA within seventy-two (72) hours of when

18

Defendant first knew that the event might cause a delay.  Defendant shall also notify the United

States in writing within seven (7) calendar days after the event at the addresses listed in Section

XII.   Such notice shall include a discussion of the following:

     A.     what action has been affected;

     B.     the specific cause(s) of the delay;

     C.     the length or estimated duration of the delay;

     D.     Defendant's rationale for attributing such delay to a Force Majeur event;

     E.     a statement of whether, in the opinion of the Defendant, such event may cause or contribute to the endangerment of public health, welfare or the environment; and

     F.     any measures taken or planned by the Defendant to prevent or minimize the delay and a schedule for the implementation of such measures.

68.     Defendant shall also provide to the United States documentation to support its

conclusion that a Force Majeure event has affected its ability to perform an action required under

this Consent Decree.  Failure to provide timely and complete notification to the United States

shall constitute a waiver of any claim of Force Majeure as to the event in question.

69.     If the United States determines that the conditions constitute a Force Majeure

event, then the deadline for the affected action shall be extended by the amount of time of the

delay caused by the Force Majeure event.  Defendant shall coordinate with EPA to determine

when to begin or resume the operations that had been affected by any Force Majeure event.  An

extension of the time for performance of obligations affected by the Force Majeure event shall

not, of itself, extend the time for performance of any other obligations.  EPA will notify

Defendant in writing of the length of the extension, if any, for performance of obligations affected by the Force Majeure event.

70.     If EPA does not agree that the delay or anticipated delay has been or will be caused by a Force Majeure event, EPA will notify Defendant in writing of its decision.

71.     If the parties are unable to agree whether the conditions constitute a Force Majeure event, or whether the length of time for fulfilling the provision of the Consent Decree at issue should be extended, any party may seek a resolution of the dispute under the procedures in Section IX of this Consent Decree.  If Defendant elects to invoke the dispute resolution procedures, it shall do so no later than fifteen (15) Days after receipt of EPA's notice.  Defendant shall bear the burden of proving, by a preponderance of the evidence: (1) that the noncompliance at issue was caused by circumstances entirely beyond the control of Defendant and any entity controlled by Defendant, including their contractors and consultants; (2) that Defendant or any entity controlled by Defendant could not have foreseen and prevented such noncompliance; and (3) the number of Days of noncompliance that were caused by such circumstances.  If Defendant carries this burden, the delay at issue shall be deemed not to be a violation by Defendant of the affected obligation of this Consent Decree identified to EPA and the Court.

## XI.     STIPULATED PENALTIES

72.     After entry of this Consent Decree, if Defendant fails to timely fulfill any requirement or obligation of the Consent Decree, including any of the requirements, tasks or obligations set forth in Appendix A or any EPA approved Mitigation Plan, Defendant shall pay a stipulated penalty to the United States for each violation of each requirement of this Consent Decree as follows:

20

| A. | For Day 1 up to and including Day 15 of noncompliance | $2,000.00 per day |
|----|----|----|
| B. | For Day 16 up to and including Day 30 of noncompliance | $3,500.00 per day |
| C. | For Day 31 and beyond of noncompliance | $5,000.00 per day |

Such payments shall be made without demand by the United States on or before the last Day of the month following the month in which the stipulated penalty accrued.

73.     Stipulated penalties under this Section shall begin to accrue on the Day after performance is due or on the Day a violation occurs, whichever is applicable, and shall continue to accrue until performance is satisfactorily completed or until the violation ceases.  Stipulated penalties shall accrue simultaneously for separate violations of this Consent Decree.

74.     Defendant shall pay any stipulated penalty within thirty (30) Days of receiving the United States' written demand.

75.     Any disputes concerning the amount of stipulated penalties, or the underlying violation that gives rise to the stipulated penalties, that cannot be resolved by the parties pursuant to the Dispute Resolution provisions in Section IX and/or the Force Majeure provisions in Section X, shall be resolved upon motion to this Court as provided in Section XVI.

76.     The filing of a motion requesting that the Court resolve a dispute shall stay Defendant's obligation to pay any stipulated penalties with respect to the disputed matter pending resolution of the dispute.  Notwithstanding the stay of payment, stipulated penalties shall continue to accrue from the first day of any failure or refusal to comply with any term or condition of this

Consent Decree.  In the event that Defendant does not prevail on the disputed issue, stipulated penalties shall be paid by Defendant as provided in this Section.

77.     To the extent Defendant demonstrates to the Court that a delay or other noncompliance was due to a Force Majeure event (as defined in Paragraph 66 above) or otherwise prevail on the disputed issue, the Court shall excuse the stipulated penalties for that delay or noncompliance.

78.     In the event that a stipulated penalty payment is applicable and not made on time, interest will be charged in accordance with the statutory judgment interest rate provided for in 28 U.S.C. § 1961.  The interest shall be computed daily from the date the payment is due until the date the payment is made.  The interest shall also be compounded annually.

79.     Defendant shall make any payment of a stipulated penalty by FedWire Electronic Funds Transfer ("EFT" or wire transfer) to the U.S. Department of Justice account in accordance with current electronic funds transfer procedures, referencing the U.S.A.O. file number to be supplied by the United States and the DOJ case numbers 90-5-1-1-10180 and 90-5-1-1-18561/1. Payment shall be made in accordance with instructions provided to the Defendant by the Financial Litigation Unit of the United States Attorney's Office for the Southern District of Illinois.  Any payments received by the Department of Justice after 4:00 P.M. (Eastern Time) will be credited on the next business day.   Further, upon payment of any stipulated penalties, Defendant shall provide written notice at the addresses specified in Section XII of this Decree.

80.     The stipulated penalties provided for in this Consent Decree shall be in addition to any other rights, remedies, or sanctions available to the United States for Defendant's violation of this Consent Decree or applicable law.  Where a violation of this Consent Decree is also a

violation of Sections 402 or 404 of the Clean Water Act, Defendant shall be allowed a credit, for

any stipulated penalties paid, against any statutory penalties imposed for such violation.

## XII.   ADDRESSES

81.   All notices and communications required under this Consent Decree shall be made

to the parties through each of the following persons and addresses:

A.   TO EPA:

 (1)   BRIAN BARWICK
   Associate Regional Counsel
   United States Environmental Protection Agency
   Region 5
   77 West Jackson Blvd.
   Mail Code:  C-14J
   Chicago, IL  60604-3590

 (2)   YONE YU
   United States Environmental Protection Agency
   Region 5
   77  West Jackson Blvd.
   Mail Code:  WW-16J
   Chicago, IL 60604-3590

B.   TO THE UNITED STATES DEPARTMENT OF JUSTICE:

 (1)   PERRY M. ROSEN
   United States Department of Justice
   Environment & Natural Resources Div.
   Environmental Defense Section
   P.O. Box 7611
   Washington D.C.  20044

 (2)   Chief, Environmental Enforcement Section
   Environment and Natural Resources Division
   U.S. Department of Justice (DJ # 90-5-1-1-10180)

P.O Box 7611, Washington, DC 20044-7611

C.     TO DEFENDANT:

(1)     New River Royalty, LLC
208 Public Square, 4th Floor
Benton, IL 62812

(2)     Jonathan D. Boggs
Bailey & Glasser LLP
209 Capitol Street
Charleston, WV 25301

## XIII.   COSTS OF SUIT

82.     Each party to this Consent Decree shall bear its own costs and attorneys' fees in this action.  Should Defendant subsequently be determined by the Court to have violated the terms or conditions of this Consent Decree, Defendant shall be liable for any costs or attorneys' fees incurred by the United States in any action against Defendant for noncompliance with or enforcement of this Consent Decree.

## XIV.   PUBLIC COMMENT

83.     The parties acknowledge that after the lodging and before the entry of this Consent Decree, final approval by the United States is subject to the requirements of  28 C.F.R. § 50.7, which provides for public notice and comment.  The United States reserves the right to withhold or withdraw its consent to the entry of this Consent Decree if the comments received disclose facts which lead the United States to conclude that the proposed Consent Decree is inappropriate, improper, or inadequate.  The Defendant agrees not to withdraw from, oppose entry of, or to

challenge any provision of this Consent Decree, unless the United States has notified the Defendant in writing that it no longer supports entry of the Consent Decree.

## XV.   EFFECTIVE DATE

84.     The Effective Date of this Consent Decree shall be the date upon which this Consent Decree is entered by the Court or a motion to enter the Consent Decree is granted, whichever occurs first, as recorded on the Court's docket.

## XVI.   CONTINUING JURISDICTION OF THE COURT

85.     This Court shall retain jurisdiction over this action in order to enforce or modify the Consent Decree consistent with applicable law or to resolve all disputes arising hereunder as may be necessary or appropriate for construction or execution of this Consent Decree.  During the pendency of the Consent Decree, any party may apply to the Court for any relief necessary to construe and effectuate the Consent Decree.

## XVII.  MODIFICATION

86.     Upon its entry by the Court, this Consent Decree shall have the force and effect of a final judgment.  Any modification of this Consent Decree shall be in writing, and shall not take effect unless signed by both the United States and the Defendant and approved by the Court.

87.     Any disputes concerning modification of this Decree shall be resolved pursuant to Section IX of this Decree (Dispute Resolution), provided, however, that instead of the burden of proof provided by Paragraph 63, the Party seeking the modification bears the burden of demonstrating that it is entitled to the requested modification in accordance with Federal Rule of Civil Procedure 60(b).

## XVIII.   <u>TERMINATION</u>

88.     Except with regard to the obligations set forth in Paragraph 54, this Consent Decree may be terminated by either of the following:

A.     Defendant and the United States may at any time make a joint motion to the Court for termination of this Decree or any portion thereof; or

B.     Defendant may make a unilateral motion to the Court to terminate this Decree after each and all of the following has occurred:

1.     Defendant has obtained and maintained compliance at the Dwina Road Site and at the Mitigation Site with all provisions of this Consent Decree and the CWA for twelve (12) consecutive months;

2.     Defendant has paid all penalties and other monetary obligations hereunder and no penalties or other monetary obligations are outstanding or owed to the United States;

3.     Defendant has certified compliance pursuant to subparagraphs B.1. and B.2., above, to the Court and all Parties; and

4.     Within forty-five (45) Days of receiving such certification from the Defendant, the United States has not contested in writing that such compliance has been achieved.  If the United States disputes Defendant's full compliance, this Consent Decree shall remain in effect pending resolution of the dispute by the Parties or the Court.

## XIX.   SIGNATORIES/SERVICE

89.     Each undersigned representative of Defendant and the Assistant Attorney General for the Environment and Natural Resources Division of the Department of Justice certifies that he or she is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind the Party he or she represents to this document.

90.     This Consent Decree may be signed in counterparts, and its validity shall not be challenged on that basis.  Defendant agrees to accept service of process by mail with respect to all matters arising under or relating to this Consent Decree and to waive the formal service requirements set forth in Rules 4 and 5 of the Federal Rules of Civil Procedure and any applicable Local Rules of this Court including, but not limited to, service of a summons.

## XX.   INTEGRATION

91.     This Consent Decree and its Appendix constitute the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement embodied in the Decree and supersedes all prior agreements and understandings, whether oral or written, concerning the settlement embodied herein.  No other document, nor any representation, inducement, agreement, understanding, or promise, constitutes any part of this Decree or the settlement it represents, nor shall it be used in construing the terms of this Decree.

## XXI.   <u>FINAL JUDGMENT</u>

92.      Upon approval and entry of this Consent Decree by the Court, this Consent

Decree shall constitute a final judgment of the Court as to the United States and Defendant.

**It is SO ORDERED.**

**Dated and entered this 12th day of August, 2013.**

s/J. Phil Gilbert

**United States District Judge**

Signature Page for *United States of America v. New River Royalty, LLC*, Consent Decree

Consented and agreed to by:

**ON BEHALF OF THE UNITED STATES:**

ROBERT G. DREHER
Acting Assistant Attorney General
Environment & Natural Resources Division
U.S. Department of Justice

Date: 6/18/13

PERRY M. ROSEN
Environmental Defense Section
Environment & Natural Resources Div.
P.O. Box 7611
Washington D.C. 20044
Tel: (202) 353-7792
Fax: (202) 514-8865
perry.rosen@usdoj.gov

Date: 6/18/13

SUMONA N. MAJUMDAR
Environmental Enforcement Section
Environment & Natural Resources Div.
P.O. Box 7611
Washington D.C. 20044
Tel: (202) 514-3581
Fax: (202) 616-6584
Sumona.Majumdar@usdoj.gov

STEPHEN R. WIGGINTON
United States Attorney

CHRISTOPHER MOORE
Assistant United States Attorney
Southern District of Illinois
9 Executive Drive
Fairview Heights, IL 62208
Tel: 618-628-3700
E-mail: chris.moore@usdoj.gov

Signature Page for *United States of America v. New River Royalty, LLC*, Consent Decree

**ON BEHALF OF U.S. ENVIRONMENTAL PROTECTION AGENCY:**

Date: 5-28-13

SUSAN HEDMAN
Regional Administrator
U.S. Environmental Protection Agency
Region 5

Date: 5/9/2013

BRIAN BARWICK
Associate Regional Counsel
U.S. Environmental Protection Agency
Region 5 (C-14J)
77 West Jackson Boulevard
Chicago, Illinois 60604-3507
Tel:  (312) 886-6620

30

Signature Page for *United States of America v. New River Royalty, LLC*, Consent Decree

_____                    Date: 5/20/13

SUSAN SHINKMAN, Director
Office of Civil Enforcement
Office of Enforcement and Compliance Assurance
U.S. Environmental Protection Agency
1200 Pennsylvania Ave., N.W.
Washington, D.C. 20460

_____                    Date: 5/17/13

MARK POLLINS, Director
Water Enforcement Division
Office of Civil Enforcement
Office of Enforcement and Compliance Assurance
U.S. Environmental Protection Agency
1200 Pennsylvania Ave., N.W.
Washington, D.C. 20460

_____                    Date: 5/14/13

JAMES VINCH, Attorney Advisor
Water Enforcement Division
Office of Civil Enforcement
Office of Enforcement and Compliance Assurance
U.S. Environmental Protection Agency
1200 Pennsylvania Ave., N.W.
Washington, D.C. 20460

31

Signature Page for *United States of America v. New River Royalty, LLC*, Consent Decree

**ON BEHALF OF DEFENDANT NEW RIVER ROYALTY, LLC:**


Date: 4-24-13

New River Royalty, LLC
8341 Express Drive, Suite C
Marion, IL 62951


Reviewed as to legal form:


Date: 4-26-13

JONATHAN D. BOGGS
Bailey & Glasser LLP
209 Capitol Street
Charleston, WV 25301

32

## APPENDIX A

This Appendix and all exhibits hereto are part of the Consent Decree executed by New River Royalty, LLC ("New River Royalty") and by the United States and is specifically incorporated therein. All actions and obligations set forth below shall be governed by the terms of the Consent Decree (which is also referred to herein as the "Decree"). This Appendix sets forth the minimum requirements of the mitigation work plan that New River Royalty, must propose to the EPA to address the Section 404 violations alleged in the United States' Complaint in this matter.

1. **Mitigation Work Plan**

   1.1. Mitigation Site Location

   The mitigation plan shall include a map showing the location of the Mitigation Site and a legal description of the Mitigation Site.

   1.2. Stream Rehabilitation

   The stream mitigation project must focus on rehabilitating the entrenched stream reaches on the Mitigation Site by restoring their original pattern and profile. This shall be accomplished through a combination of activities, including but not limited to, placing in-stream structures, stabilizing the banks, and creating secondary floodplains where appropriate.

   The specific methods used will depend on detailed surveys and plans that have yet to be finalized, but shall be submitted for approval in the proposed mitigation plan according to the schedule determined in Paragraph 37 of the Consent Decree.

   1.3. Culvert Modifications

   Culverts located at stream crossings within the Mitigation Site and downstream near the Pond Creek mine shall be modified to enhance the passage of aquatic organisms and improve connectivity with upstream and downstream stream reaches. These modifications may include, but are not limited to:

   1.3.1. placement of rock or concrete weirs upstream and/or downstream of culverts to stabilize and raise the existing streambed elevation,
   1.3.2. installation of baffles inside existing culverts to improve fish passage,
   1.3.3. placement of large rocks of various sizes to diversify the bed load inside culverts, and

1.3.4.  partial blockage or filling of excess culvert capacity to improve connectivity during low-flow conditions.

1.4. Riparian Buffer Establishment

Forested riparian buffers shall be established or enhanced (where existing) for a minimum distance of 100 feet from both banks of each rehabilitated stream reach.

In wetland riparian buffer areas, the ground cover shall be seeded according to the species and quantities specified in Table 1.  Trees shall be planted using either bare-root seedlings or Root Production Method (RPM) saplings.  Species for tree planting in wetland riparian buffer areas shall be selected from Table 2.  Approximately equal numbers of each species selected shall be planted.  At least five different species of trees shall be planted and at least two of those shall be hard-mast producing (i.e. species of oak or hickory).  If bare-root seedlings are specified, they shall be planted on 10 X 10 foot centers (450 seedlings/acre); if RPM saplings are specified they shall be planted on 20 X 20 foot centers (109 saplings/acre).  Both RPM saplings and bare-root seedlings shall be planted in the fall—from October 15 through December 15.

In non-wetland riparian buffer areas, the ground cover shall be seeded according to the species and quantities specified in Table 3.  Trees shall be planted in the non-wetland riparian buffer areas using either bare-root seedlings or RPM saplings.  Species for planting in non-wetland riparian buffer areas shall be selected from Table 4.  Approximately equal numbers of each species selected shall be planted.  At least five different species of trees shall be planted and at least two of those shall be hard-mast producing (i.e. species of oak or hickory).  Bare-root seedlings shall be planted on 10 X 10 foot centers (450 seedlings/acre).  RPM saplings shall be planted on 20 X 20 foot centers (109 saplings/acre).  Both RPM saplings and bare-root seedlings shall be planted in the fall—from October 15 through December 15.

Vegetation between planted rows of trees and shrubs shall be mowed for at least two growing seasons following planting.  Mowing shall reduce competition from vegetation (planted and natural regeneration) and shall assist in the growth and survivorship of planted trees.

Table 1.  Native species of grasses for seeding in wetland riparian buffers.

| Common name | Scientific name | Wetland indicator status | Pounds/acre Pure live seed |
|---|---|---|---|
| Redtop | *Agrostis alba* | FACW | 3 |
| Sweet Wood-Reed | *Cinna arundinacea* | FACW | 0.5 |
| Virginia wild rye | *Elymus virginicus* | FACW | 2 |

2

| Timothy* | *Phleum pretense* | UPL | 3 |
| Annual rye grass* | *Secale cereale* | UPL | 50 |

* Nurse Species

Table 2.  Native species of trees for planting in wetland riparian buffers.

| Common name | Scientific name | Wetland indicator status |
|---|---|---|
| Red maple | *Acer rubrum* | FAC |
| River birch | *Betula nigra* | FACW |
| Pecan | *Carya illinoinensis* | FACW |
| Shellbark Hickory | *Carya laciniosa* | FACW |
| Sweet gum | *Liquidambar styraciflua* | FACW |
| Sycamore | *Platanus occidentalis* | FACW |
| Swamp white oak | *Quercus bicolor* | FACW |
| Overcup oak | *Quercus lyrata* | OBL |
| Basket oak | *Quercus michauxii* | FACW |
| Pin oak | *Quercus palustris* | FACW |
| Shumard oak | *Quercus shumardii* | FACW |

Table 3.  Native species of forbs and grasses for seeding in non-wetland riparian buffers.

| Common name | Scientific name | Pounds/acre Pure live seed |
|---|---|---|
| Cup plant | *Silphium perfoliatum* | 3 |
| Golden glow | *Rudbeckia laciniata* | 3 |
| Big bluestem | *Andropogon gerardii* | 5 |
| Virginia wild rye | *Elymus canadensis* | 2 |
| Annual rye grass* | *Lolium multiflorum* | 50 |

3

| Oats* | *Avena sativa* | 64 |
|---|---|---|

\* Nurse Species

Table 4.  Native species of trees for planting in non-wetland riparian buffers.

| Common name | Scientific name | Wetland indicator status |
|---|---|---|
| Shagbark hickory | *Carya ovata* | FACU |
| Hazelnut | *Corylus americana* | FACU |
| Black walnut | *Juglans nigra* | FACU |
| American plum | *Prunus americana* | UPL |
| White oak | *Quercus alba* | FACU |
| Bur oak | *Quercus macrocarpa* | FAC |

1.5. Stormwater Pollution Prevention Plan

New River Royalty shall be required to adhere to Illinois Environmental Protection Agency requirements for obtaining Phase I or Phase II (as appropriate) NPDES permits for Storm Water Discharges From Construction Site Activities before commencing mitigation construction activities.  New River Royalty shall provide a copy of the Storm Water Pollution Prevention plan and Notice of Intent developed for the Mitigation Site to EPA at least thirty (30) Days prior to starting construction.

## 2.  Maintenance Plan

Following mitigation construction, rehabilitated stream banks and riparian buffers shall be seeded to a temporary ground cover species and permanent vegetation seed mix (as previously described) to provide protection from erosion.  Other erosion control measures should also be used to stabilize the soil until the permanent vegetation cover takes hold. Permanent ground cover vegetation shall be mowed, or otherwise controlled, for at least two years to allow planted woody species to become established.

At least once during the growing season all riparian buffers shall be inspected for invasive species.  If exotic or undesirable species exceed 10% total aerial cover at the Mitigation Site, New River Royalty shall control undesirable vegetation, which shall consist of mowing, hand-pulling, and/or soil tillage to remove the infestation.  Herbicides shall be used to remove persistent exotic and/or undesirable species including, but not limited to:  Cattails, phragmites, bush honeysuckle, multiflora rose, autumn olive, Japanese honeysuckle, Japanese stiltgrass, sandbar willow, sericea lespedeza, and reed canary grass.

During each biannual assessment and after severe flood events, in-stream structures and culvert modifications shall be inspected and repaired where necessary. Secondary floodplains shall also be inspected to determine whether they are functioning as intended and repaired as necessary.

**3.  Performance Standards**

New River Royalty shall meet the following performance standards for the vegetation, hydrology, and biology of mitigation streams and riparian corridors. Rehabilitated stream reaches shall be considered successful if the following conditions are met at the end of the required monitoring period. In general, each rehabilitated stream reach should have a stable stream channel that supports aquatic life and serves important habitat functions. The vegetation standards shall apply to all riparian buffers that are proposed for planting or enhancement adjacent to the rehabilitated streams.

3.1. <u>Vegetation Standards for Rehabilitated Bottomland Streams with Wetland Riparian Vegetation</u> (Streams with riparian zones that are delineated as wetlands)

| Description | Bare Root Seedlings | RPM trees |
|---|---|---|
| Tree Planting Rate | 450 per acre | 109 per acre |
| Survival Requirement | 70% of Initial Stock | 80% of Initial Stock |
| Species planted[1] | Minimum 5 species | |
| Species Success | No one species may make up more than 25% of final surviving stock. | |
| Tree Indicator Status | Complete community greater than 70% FAC or wetter status. | |
| Ground Cover type | Wetland Seed Mix | |
| Ground Cover success | Planted species account for 80% of ground cover at end of monitoring period. No one herbaceous species may comprise more than 40% of the ground cover at the end of the monitoring period. | |
| Invasive Species | Invasive species shall account for no more than 10% of total aerial cover at the end of the monitoring period. Invasive species include: Cattails, phragmites, bush honeysuckle, multiflora rose, autumn olive, Japanese honeysuckle, Japanese stiltgrass, sandbar willow, sericea lespedeza, and reed canary grass. | |

3.2. <u>Vegetation Standards for Rehabilitated Streams with Upland Riparian Vegetation</u> (Streams with riparian zones that are delineated as upland)

| Description | Bare Root Seedlings | RPM trees |
|---|---|---|
| Tree Planting Rate | 450 per acre | 109 per acre |

---

[1] No one species may make up more than 20% of species planted, see "Permanent Tree Species List" of this attachment for approved species. Approved "Hard Mast" species will comprise at least 80% of the initial planted stock in riparian areas. Trees with a wetland indicator of FACU or UPL will not be planted in stream riparian areas.

| Survival Requirement | 70% of Initial Stock | 80% of Initial Stock |
|---|---|---|
| Species planted[2] | Minimum 5 species | |
| Species Success | No one species may make up more than 25% of final surviving stock. | |
| Ground Cover type | Upland Seed Mix | |
| Ground Cover success | Planted species account for 80% of ground cover at end of monitoring period. No one herbaceous species may comprise more than 40% of the ground cover at the end of the monitoring period. | |
| Invasive Species control | Invasive species shall account for no more than 10% of total aerial cover at the end of the monitoring period. Invasive species include: Cattails, phragmites, bush honeysuckle, multiflora rose, autumn olive, Japanese honeysuckle, Japanese stiltgrass, sandbar willow, sericea lespedeza, and reed canary grass. | |

3.3. Hydrology and Biology Standards for Stream Mitigation

1. In-stream structures are stable and performing as intended.
2. Streambanks are not actively eroding or being undercut by the channel. Appropriate measures to control erosion are implemented.
3. Secondary floodplains (where constructed) are stable and holding.
4. Cross culverts do not impede the movement of aquatic life upstream or downstream of the crossing.
5. Cross culverts allow the passage of both flood flows and low flows.
6. The constructed stream channel has sinuosity suitable for the desired stream type proposed in the mitigation plan.
7. The constructed stream channel length meets, or exceeds, the channel length proposed in the mitigation plan.
8. The constructed stream type meets the stream type proposed in the mitigation plan.
9. The constructed stream channel epifaunal substrate is suitable for the desired stream type proposed in the mitigation plan.
10. The EPA RBP stream "score" for each reach meets, or exceeds, the baseline EPA RBP "score" determined prior to mitigation construction.
11. The constructed stream has a restored level of biologic activity that meets, or exceeds, the biologic activity in the pre-disturbance stream.
12. The constructed stream shall have a surface connection to "Waters of the United States" as defined by current law and therefore be designated as jurisdictional pursuant to Section 301 of the Clean Water Act 42 U.S.C. § 1311.

4. **Monitoring Requirements**

---

[2] No one species may make up more than 20% of species planted, see "Permanent Tree Species List" of this attachment for approved species. Approved "Hard Mast" species will comprise at least 80% of the initial planted stock in riparian areas.

After the completion of mitigation construction activities, New River Royalty shall monitor the Mitigation Site for seven (7) years according to the following criteria and schedule:

### 4.1. Biannual Stream and Riparian Buffer Assessments

New River Royalty shall complete biannual Mitigation Site assessments of rehabilitated streams and riparian buffers to determine whether performance standards are being met. The spring assessment shall occur early in the growing season (April). The fall assessment shall occur late in the growing season (October). The assessment methods described in EPA 841-B-99-002, Rapid Bioassessment Protocols for Use in Streams and Wadeable Rivers shall be used during each bi-annual assessment. In addition to the EPA-RBP, The "Rosgen Method" of stream assessment, described in Applied River Morphology by Dave Rosgen, shall also be used during the first and final year of monitoring.

Beginning the year after mitigation construction activities, each rehabilitated stream shall also be monitored for macroinvertrebrate species (B-IBI) and/or fish species (IBI) during the spring biannual Mitigation Site assessments (March15-July 15). Biologic activity shall be documented and included in the Annual Monitoring Reports. Suitable B-IBI and IBI biologic study(ies) shall be repeated annually during the monitoring period. Biologic studies of rehabilitated streams shall be used to provide documentation of enhanced stream biologic activity and stream habitat functions.

Macroinvertebrate species (B-IBI) and/or fish species (IBI) biologic studies shall be completed by methods described in EPA 841-B-99-002, Rapid Bioassessment protocols for Use in Streams and Wadeable Rivers.

### 4.2. Photo Station Monitoring Locations

Permanent "Photo Station Monitoring Locations" shall be shown on the mitigation maps. One permanent photo station/assessment site shall be installed:

- per 500 feet of rehabilitated intermittent stream,
- per 1,500 feet of rehabilitated ephemeral stream,
- upstream and downstream of every stream crossing, and
- at locations vital to documenting successful rehabilitated stream reaches and/or identify problems encountered.

At least one permanent photo station/assessment site shall be installed for every stream reach.

## 5. Reporting Protocols

New River Royalty shall complete an Annual Monitoring Report of the biannual Mitigation Site assessments and submit the report with supporting maps, photos, delineation sheets and other documentation to the EPA by January 30 of the year following the biannual assessments. The first annual report shall be submitted following the first complete growing season for the rehabilitated stream reach. The certification of completion of mitigation

activities (as described in Paragraph 46 of the Consent Decree) shall be required before submission of the first annual report.

5.1. Biannual Stream Assessment Reporting Criteria

The Mitigation Site biannual stream assessments shall investigate and document:

5.1.1. the growth, progress, and success of the permanent vegetation,
5.1.2. the permanent vegetation ground and species diversity,
5.1.3. the progress of rehabilitation of a stable stream channel (restored channel has defined bed & banks) with minimal channel "head cutting",
5.1.4. the hydrology/flow regime of the restored channel,
5.1.5. the condition of in-stream structures and secondary floodplains,
5.1.6. the condition of modifications at stream cross culverts,
5.1.7. the progress of rehabilitation of stream epifaunal substrate,
5.1.8. the progress of rehabilitation of stream biologic activity.

6. **Site Protection**

New River Royalty owns and controls all property that has been proposed for mitigation. All rehabilitated streams and buffer zones shall be protected by a deed restriction or conservation easement with a third party beneficiary. A copy of the recorded permanent deed restriction or conservation easement for the mitigation areas shall be provided to the EPA. Permanent legal protection for rehabilitated streams shall be recorded in the appropriate County Courthouse no later than sixty (60) days after the completion of all stream mitigation construction activities.

In addition to legal protection, New River Royalty shall maintain signage at regular intervals around the perimeter of the Mitigation Site to prevent unauthorized access to the Mitigation Site. Other access controls shall also be required, as necessary, to prevent damage to the mitigation areas (e.g. from all-terrain vehicles).

7. **Adaptive Management Plan**

If the performance standards are not met for all or any portion of the mitigation project in any year, New River Royalty shall prepare an analysis of the cause(s) of failure and, if determined necessary by the EPA, propose remedial actions in writing for approval within thirty (30) days of receiving EPA's response. Upon approval of the remedial actions by EPA pursuant to Paragraph 38 of the Consent Decree, New River Royalty shall implement the plan and continue monitoring the Mitigation Site.

In the event EPA determines the mitigation project cannot be successfully completed at the intended Mitigation Site, New River Royalty shall propose alternative stream mitigation sites. Upon approval of alternative stream mitigation sites, New River Royalty will have one hundred eighty (180) Days to begin construction at the alternative stream mitigation sites pursuant to an approved plan and schedule submitted in accordance with Paragraph 37 of the Consent Decree.

8. **Completion of Mitigation Requirements**

When a rehabilitated stream reach meets the Performance Standards outlined in Paragraph 3 above at the end of the monitoring period, the stream mitigation will be judged a success. After submittal of the documentation of success in the Annual Monitoring Report, New River Royalty shall petition the EPA for a written determination of successful stream mitigation and termination of applicable monitoring requirements for the successful stream reach. If there is a dispute over whether a stream reach meets the Performance Standards, the Parties will submit to the Dispute Resolution procedures outlined in Section IX of the Consent Decree.

If, at the end of the monitoring period, a rehabilitated stream reach does NOT meet the performance standards, New River Royalty shall submit a written plan of action to be taken to enhance the mitigation stream reach. Alternative plans for other mitigation options may also be submitted to the EPA for review in accordance with Paragraph 37 of the Consent Decree. Monitoring of mitigation sites shall continue until the EPA provides written determination of successful stream mitigation and allows monitoring to be discontinued.